# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 46544

CHOICE FEED, INC., an Idaho Corporation, )
)
   Plaintiff-Respondent-Cross Appellant, )
)
v. )
)
EDWARD R. MONTIERTH, aka RAY )
MONTIERTH, )
)
   Defendant-Appellant-Cross Respondent, )
)
and )
)
SUSAN L. MONTIERTH, GARY JOHNSTON, )
Trustee of the Peckham Road Trust, )
)
   Defendants. )

**Boise, November 2020 Term**

**Opinion filed: February 9, 2021**

**Melanie Gagnepain, Clerk**

Appeal from the District Court of the Third Judicial District of the State of Idaho, Canyon County. Bradly S. Ford, District Judge.

The judgment of the district court is <u>affirmed in part</u> and <u>reversed in part</u>.

Eismann Law Offices, Nampa, for Appellant. Ryan Martinat argued.

Fisher and Hudson, Boise, for Respondent. Vaughn Fisher argued.

---

MOELLER, Justice

This case concerns a sadly familiar story: an oral real estate transaction gone terribly wrong. Choice Feed, Inc., sued Ray Montierth and Susan Montierth, alleging that Ray breached an oral agreement to sell his feedlot property to Choice Feed once he arranged a 1031 tax deferred agreement. Although Ray collected money from Choice Feed that was to go toward the purchase of the feedlot property, he never arranged a 1031 exchange. Instead, without notice to Choice Feed, Ray sold the feedlot property to someone else while continuing to accept monthly payments from Choice Feed. At the conclusion of the trial, the jury found in favor of Choice Feed on one count of fraud against Ray, awarded compensatory damages, and assessed $250,000

1

in punitive damages. Ray filed a motion for judgment notwithstanding the verdict, which the district court granted in part, thereby reducing the jury's awards of both the compensatory and punitive damages. Ray appeals the jury's verdict, including the compensatory and punitive damages that were reduced by the district court. Choice Feed cross-appeals the district court's decision granting Ray's motion for judgment notwithstanding the verdict and the resulting reduction in damages. We affirm in part and reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

In early 2006, Ray[1] and Susan purchased a feedlot in Wilder, Idaho, from the Mikelson Family Limited Partnership. The feedlot consists of 127 acres in Canyon County. After Ray purchased the feedlot, the Mikelson family continued to operate their cattle business from the feedlot. From 2009 to 2012, Ray rented the feedlot to Tom Floyd. The lease with Floyd required him to maintain and repair the feedlot as necessary to carry out its operation. Any improvements to the feedlot were to be approved in advance by Ray. The lease ended in 2012.

In December of 2012, Paul Mikelson, intending to continue in the cattle feeding industry, formed a corporation, Choice Feed, Inc., for that purpose. Trent Anderson later purchased an interest in Choice Feed and now both Paul and Trent own it. In late 2012, Choice Feed assumed the prior lease between Ray and Floyd, took over operation of the feedlot, and began making payments to Ray on a month to month oral lease. The assumed lease required Choice Feed to maintain and repair the feedlot as needed to continue operations and to obtain approval from Ray in advance for any improvements to the feedlot.

At the end of July 2014, Trent met with Ray to discuss the sale and purchase of the feedlot. Ray maintains that he did not know whether he was discussing a sale with Choice Feed or with Trent and Paul as individuals. Ray stated that he would not take less than $1,250,000. Ray also wanted a cash deal to utilize a 1031 tax deferred exchange (hereinafter "1031 exchange").[2] In an email following their meeting, Trent memorialized the terms of Choice

---

[1] Inasmuch as some of the parties contain the same last name, and because the parties were commonly referred to by their first names in the proceedings below, for ease of reference we will generally use first names throughout. We also consistently refer to Ray in the singular, even though this lawsuit involves both Ray and his wife Susan.

[2] A 1031 exchange is a like-kind exchange of real property where a property owner sells a property and reinvests its proceeds into a similar property having equal or greater value, thereby avoiding any capital gains tax on the sale of the initial property. *See* 26 U.S.C.A. § 1031.

Feed's offer to purchase the feedlot as follows: a seller-financed loan of $1,250,000 for 15 years at 5% interest with a balloon payment for the remaining balance at the end of the seventh year. Trent noted Choice Feed's concern about the condition of the feedlot and the repairs and improvements it required. Ray maintains that there was no deal at the end of this meeting and he was not interested in Trent's suggestion about installment payments.

On September 2, 2014, Trent and Ray met again to discuss the purchase and sale of the feedlot. This time they were joined by Doug Mikelson. Doug is Paul's brother and works for Choice Feed. Doug, Paul, and Trent had previously discussed moving their business from the feedlot because of its poor condition. The feedlot needed extensive repairs and improvements that they were unwilling to make unless they owned the property. Doug told Ray that if Choice Feed could not purchase the feedlot, they would move their business elsewhere as soon as possible. Ray said, "[w]ell, okay." Doug and Trent then modified their previous offer to Ray as follows: they reduced the payout of the loan to ten years with a balloon payment at 5 years and they increased the interest rate from 5% to 6%. Doug testified that Ray seemed to like the offer but he wanted to talk to his wife and his accountant first before finalizing it. Before leaving, the parties agreed to raise Choice Feed's rent more than $3,000 per month, with the additional funds to be applied toward the purchase of the feedlot until the sale was finalized. Shortly after the meeting, Choice Feed delivered a check to Ray that was back-dated to September 1, 2014, for $13,877.56 with the memo line reading: "First payment feedlot purchase." Ray accepted and cashed the check. Trent believed a deal was made and Choice Feed was responsible for the feedlot at that point. Trent testified that this is why Choice Feed kept its business at the feedlot and began making costly improvements without Ray's consent.

Ray recalls the meeting on September 2, 2014, differently. Ray agrees he met with Trent and Doug and they discussed the purchase and sale of the feedlot. Trent proposed a modified installment schedule with a higher interest rate, but Ray did not intend on entering an agreement to sell the feedlot on installment terms. Ray reiterated his need for a 1031 exchange in order to avoid taxes. Trent suggested making extra payments on top of the rent toward the purchase. Ray stated that the extra payment was not necessary but he ultimately accepted it. Ray asserts that at the end of the meeting he clarified that there was no deal unless he accepted the terms, conferred with his wife, attorney, and tax advisor, and he arranged a 1031 exchange. Trent testified[3] that

---

[3] Trent did not testify at trial due to a medical accident he had; however, his deposition was read to the jury.

the 1031 exchange was not a "deal breaker," and agreed to allow Ray sufficient time to work out a qualified exchange. Trent stated that if Ray had told Choice Feed that he could not do the deal they proposed, Choice Feed would have terminated the lease and left the feedlot that same day.

On November 6, 2014, Choice Feed sent Ray a draft purchase and sale agreement and other documents (hereinafter "draft agreement") for the sale of the feedlot. The draft agreement reflected the terms of Choice Feed's last offer. The only exception was that "KPT, LLC" was listed as the entity purchasing the feedlot, instead of Choice Feed. At trial, Choice Feed clarified, through the testimony of Doug and Paul that KPT was the entity it was putting together to purchase the feedlot. Nevertheless, Ray did not sign the draft agreement, as he informed Choice Feed that he was still waiting to put together a three-way 1031 exchange.

Ray, on the other hand, claimed he had never heard of KPT before, but he was not concerned about it. He testified that the draft agreement was problematic. For example, the proposal was secured by a deed of trust on the feedlot, something that Ray thought was prohibited by Idaho Code section 45-1502 because the feedlot is over 40 acres. Despite being a licensed attorney (since 1988) and a real estate agent (since 1975) in Idaho with experience in this area, Ray did not vocalize this alleged objection about the draft agreement to Choice Feed.[4] The parties met again in January of 2015 with other investors while Ray attempted to put together a 1031 exchange. Ray testified that he was having trouble finding a party with whom he could conduct a 1031 exchange.

On January 13, 2015, Ray received a postcard from Gary Johnston inquiring whether Ray would sell the feedlot to him as trustee of the "Peckham Road Trust." Gary and Ray met in person around February 21, 2015. Gary had prepared a written cash offer to Ray of $1,250,000 for the feedlot. Gary and Ray again met on March 3, 2015, and toured the feedlot. Ray and his wife signed a contract with Gary for the sale of the feedlot on March 3, 2015. Closing was set for June 17, 2015. Ray did not tell anyone associated with Choice Feed about this transaction.

Gary asked for an amendment to the contract on April 1, 2015, because the feedlot needed a sprinkler system and other significant repairs and improvements he had not originally noticed. Ray agreed, and lowered the sale price by $75,000. Gary deposited earnest money shortly thereafter. Ray mentioned to Gary during their first phone call that there was a tenant operating the feedlot and there had been an offer made to purchase it. However, when Gary

---

[4] Ray testified that he only generally told Doug that the draft agreement needed to be revised and changed.

testified, he did not recall Ray telling him about a possible deal with Choice Feed or that it was making extra payments to Ray above the monthly rent.

Ray saw Paul on the feedlot on April 29, 2015. Paul testified that he voiced concerns to Ray about finalizing a deal. Even though Ray had already agreed to sell the feedlot to Gary just a few weeks earlier, Ray told Paul that they could still get a deal done, but they needed an appraisal, financial records, tax returns, or a broker's price opinion to get an investor. Ray said he would get in contact with a realtor. Again, Ray said nothing to Paul indicating that he had already signed a contract to sell the feedlot to Gary.

On June 11, 2015, Ray sent an email to Choice Feed advising that he had sold the feedlot to a third party. Ray also advised that they could offset any monetary credits from the additional lease payments by applying them to Choice Feed's outstanding balance for hay owed to Ray. Ray testified that Choice Feed originally owed Ray $69,424.80 for hay. It had since been credited with $35,000 toward the debt, leaving a remaining balance of $34,424.80. Ray had not told Choice Feed that he had been taking the extra money it had been paying toward the feedlot's purchase and crediting it to the hay balance. At trial, Ray's deposition was read to the jury in which he admitted: "*I'm not saying that's why they paid it, but it's part of the reason I was willing to accept it*." (Emphasis added).

Choice Feed made a total of nine monthly rent payments of $13,877.56 from September of 2014 to May of 2015. The memo line of each payment check referenced that it was payment for purchase of the feedlot. Around June 30, 2015, Ray sent an eviction notice to Choice Feed.

Choice Feed claims that between September 2014 and June 2015, when Ray gave notice that he was selling the feedlot to someone else, it had already made substantial improvements to the feedlot. Paul testified extensively about these improvements, explaining they included replacing or repairing railroad ties and poles, water troughs, a heat pump, office furnace, PVC piping, water tanks, plumbing, labor, and a rotor hammer, among other improvements. Paul testified that Choice Feed only made these improvements because he believed the lease – which required them to seek approval in advance of improvements – no longer applied because they were purchasing the feedlot. Ray testified that he did not know about any of the repairs or improvements Choice Feed made and it never sought or was granted his approval.

B.  **Procedural History**

5

On June 12, 2015, the day after Ray informed Choice Feed that he had sold the feedlot to another buyer, it filed a complaint against Ray and his wife Susan. In its second amended complaint, Choice Feed alleged eight different causes of action: (1) breach of contract against Ray for violating the agreement to sell the feedlot to Choice Feed; (2) breach of covenant of good faith and fair dealing against Ray for agreeing to sell the feedlot to Choice Feed, accepting and retaining Choice Feed's payments to purchase the feedlot, and then selling the feedlot to another entity; (3) unjust enrichment against Ray for accepting and retaining Choice Feed's payments to purchase the feedlot and for making substantial improvements to the feedlot; (4) fraud against Ray for his representation in August of 2014 to Choice Feed that they had an agreement to purchase the feedlot; (5) a second count of fraud against Ray for his representation that he would complete the deal after he arranged for a 1031 exchange;[5] (7) a lien on the feedlot due to Choice Feed's payments made toward its purchase; (8) a quiet title action on the feedlot because Gary was not a good faith purchaser; and (9) unjust enrichment against Gary because Choice Feed made substantial improvements to the feedlot after Gary purchased it. Choice feed also requested attorney fees under Idaho Code section 12-120. Later, Choice Feed was granted leave to amend its complaint in order to seek punitive damages against Ray.

Ray answered Choice Feed's complaint and denied each allegation. He asserted twenty-six affirmative defenses. Ray also brought counterclaims against Choice Feed for the hay debt for $34,424.00 and for fraud.

On September 25, 2015, Choice Feed and Gary stipulated that Choice Feed would remain in possession of the feedlot until trial and pay $10,000 in rent to Gary each month. Choice Feed and Gary ultimately reached a mediated settlement whereby Gary granted Choice Feed an option to purchase the feedlot in the future for $1,425,000, an additional $175,000 over the original amount with Ray. Choice Feed then released Gary from the lawsuit. As a result, count 1 was voluntarily dismissed by Choice Feed. Choice Feed and Gary then entered into a stipulation to dismiss counts 2, 7, 8, and 9 of Choice Feed's second amended complaint with prejudice. All that remained were Choice Feed's two counts of fraud (counts 4 and 5), their unjust enrichment

---

[5] Although Choice Feeds asserts it has pled nine cause of actions, only eight different claims are identified in the pleadings. While each count is numbered sequentially from count 1 to count 9, the second amended complaint inadvertently skips count 6. Nevertheless, the mistaken numbering has been preserved for ease of reference and to avoid confusion.

claim (count 3), and their punitive damages claim against Ray. Ray's counterclaims for fraud and the open hay account also remained.

Trial was scheduled to commence on January 24, 2018. The day before trial, the district court held a status conference to address jury instructions, verdict forms, and any evidentiary issues. During the status conference, Ray objected to Choice Feed's proposed instruction on fraud damages on the basis that it sought the "benefit of the bargain" theory of recovery. Because the objection was made so close to trial and without any notice, the district court was unable to rule on the objection at that time. It continued the trial and allowed the parties to provide additional briefing and argument to the court. During the hearing, Choice Feed noted:

> Your ruling could affect – well, obviously could affect the damages that we present to the Court. And the one thing that instantly comes to mind here – and what I'm about to say is going to sound rather ironic at this point in time – there's an allegation that over $70,000 of improvements were made to the feedlot once my clients thought they were buying it. We forewent those damages because we thought that we were getting the damages otherwise.
> . . . .
> Depending upon how the Court rules, that might – we might change our mind about that because we might not be otherwise getting the benefit of it.

Choice Feed's brief on damages asserted that it should be permitted to recover damages pursuant to the "benefit of the bargain" rule based on the agreement it believed it had reached with Ray. Choice Feed's memorandum stated: "Under its damage model, Choice Feed is not seeking the value of the improvements (approximately $70,000) that it made to the property in reasonable reliance on [Ray's] false representation that he accepted Choice Feed's bargain to build equity in the property over a five-year period."

On the other hand, Ray argued that Choice Feed's damage model would allow recovery on a breach of contract where there was no enforceable contract and may possibly allow a double recovery of damages. Ray maintained that Choice Feed should be limited to seeking damages under the "out of pocket loss" rule.

On April 4, 2018, the district court issued a written decision on the fraud damages issue and agreed with Ray's analysis, limiting Choice Feed's damage recovery to the "out of pocket loss" rule. It concluded: "[Choice Feed] in this case is limited to the value of the payments made by [Choice Feed] from the time of the alleged fraud until the falsity of the representations was

revealed to [Choice Feed] offset by the value of any benefit that the [Choice Feed] received for those payments."

The district court held a status conference on April 4, 2018, in preparation for the rescheduled trial. Choice Feed clarified, pursuant to the district court's recent order denying Choice Feed's "benefit of the bargain" damages theory, that Choice Feed would be seeking recovery for the improvements made to the feedlot as out of pocket expenses. Ray argued against these improvement damages, this time stating that he had no notice of the total amount of improvements. Ray further asserted that he had been preparing for trial based upon Choice Feed's representation in its briefing that it was not seeking those damages. The district court tentatively ruled that Choice Feed would be allowed to seek the improvement expenses at trial. The following day, the district court finalized its tentative ruling and allowed Choice Feed to seek damages for the out of pocket expense of its improvements at trial. After the district court's ruling, Ray argued that Choice Feed should not be able to claim improvement damages because it specifically waived and relinquished its right in its briefing. The district court did not specifically respond to or otherwise address this argument and stood by its previous ruling.

Before trial, Ray also filed a motion to dismiss the complaint under Idaho Rule of Civil Procedure 9(b) and 12(b)(6), asserting that Choice Feed failed to plead both their fraud counts with particularity. Ray relied on *Dengler v. Hazel Blessinger Family Trust*, 141 Idaho 123, 106 P.3d 449 (2005), asserting that the pleadings in that case were similar to Choice Feed's pleadings. In an oral ruling from the bench, the district court disagreed with Ray's argument that the allegations were not pled with particularity, explaining on the record:

> With regard to count 5, the Court struggled with this one a little more just because, starting at paragraph 103, the representation seems, I guess, a little less well-drafted. But in reviewing the paragraphs 103 through 113 and particularly in the context of the detail provided in this entire second amended complaint, Court finds that the plaintiffs have sufficiently identified the detail of the circumstances of the alleged fraud and the representation which they consider to be fraudulent.

An eight-day jury trial commenced on April 9, 2018, with the parties presenting evidence and testimony consistent with the aforementioned facts. At the conclusion of the evidentiary phase of the trial, Choice Feed moved for a directed verdict on Ray's counterclaim for fraud, arguing Ray did not present any evidence of monetary damages. The district court granted Choice Feed's motion for directed verdict on Ray's counterclaim, concluding that Ray failed to

8

present evidence of an essential element of fraud by failing to present any evidence of monetary damage.

At the close of the evidentiary phase, during the jury instruction conference, Ray objected to the proposed jury instruction on Choice Feed's count 5 fraud claim. Ray argued that the proposed instruction did not reflect what Choice Feed had pled in its complaint, specifically referencing paragraph 103 and asserting that the instruction should reflect the complaint. The district court overruled Ray's objection and gave the proposed jury instruction, noting:

> The Court has considered [Ray's] request with regard to 205. The Court will give instruction 205 as the proposed instruction has been presented to the attorneys, noting, again, that count 5, the second amended complaint, contains some clerical errors that make it awkward and do not mirror what's actually provided in 205. But likewise, parties have, in my belief, understood what the claim was all along and have conducted discovery, presented motions in relationship to it as noted. And the evidence presented to the jury is consistent with the claim for fraud as set forth in 205. And to the extent the existing pleadings are – will be amended to conform to the evidence presented to the jury. And the instruction reflects the evidence presented to the jury.

The jury later returned a verdict for Ray on Choice Feed's fraud allegation in count 4, but ruled in favor of Choice Feed on its allegation of fraud in count 5. The jury awarded $49,459.19 in compensatory damages to Choice Feed and offset it against Ray's open hay account for $34,424.80. The jury also assessed $250,000 in punitive damages against Ray. On May 8, 2018, the district court entered judgment consistent with the jury's verdict.

Following the trial, Ray filed a motion for judgment notwithstanding the verdict (JNOV) pursuant to Idaho Rule of Civil Procedure 50(b). Ray asserted: (1) a directed verdict should be entered in favor of Ray on count 5 because Choice Feed failed to prove specific elements of fraud; (2) the compensatory damages must be reduced because some of the improvements were not logically made due to Ray's purported fraud; (3) Choice Feed was not entitled to claim improvement damages because Choice Feed was required to obtain Ray's approval beforehand; (4) an award of compensatory damages based on the improvements would result in a double recovery for Choice Feed; (5) three of the nine monthly rent payments occurred before the jury's finding of fraud in count 5; (6) punitive damages were unsupported by the facts of the case; (7) punitive damages does not deter the particular conduct in this case; (8) Choice Feed is not entitled to punitive damages because the injury, if any, was suffered by KPT; and, (9) the punitive damages amount assessed by the jury was unconstitutional.

9

The district court granted Ray's JNOV motion in part and denied it in part. The district court affirmed the jury's verdict on count 5. However, it reduced the compensatory damages for count 5 because all of the damages were not proximately caused by the fraud alleged in count 5. The district court reasoned that count 5 alleged Ray made the fraudulent representation after he received the draft agreement. Therefore, Choice Feed was only entitled to compensatory damages from the time Ray received the draft agreement through May 2015. The district court further found that the 5.05 ratio between the compensatory damage award ($49,459.22) and the punitive damages award ($250,000.00) was supported by substantial and competent evidence to justify the punitive damages amount. However, because the district court reduced the compensatory damage award, it held that the punitive damage award should be reduced by the same proportion. Therefore, the district court reduced the award of compensatory damages to $26,076.77 and, accordingly, reduced the punitive damages award to $131,687.69 to mirror the original 5.05 ratio between compensatory and punitive damages.

On August 7, 2018, after the district court's ruling on Ray's JNOV motion, both parties submitted amended judgments to the district court. Because the proposed judgments differed, the district court held a telephonic conference. During the conference, Ray asserted that the amended judgment should include an award of pre-judgment interest on his hay claim. The district court denied Ray's request, noting that he did not raise this issue in his JNOV motion nor did Ray file a motion pursuant to Idaho Rule of Civil Procedure 59(e) within fourteen days of the entry of the original judgment. Because Ray's request was ninety one days after the entry of the judgment, the district court found it was untimely. On October 4, 2018, the district court filed a first amended judgment with the aforementioned changes in compensatory and punitive damages. Ray timely filed a notice of appeal.

On October 18, 2018, Ray filed a motion seeking pre-judgment interest, re-asserting that he was entitled to prejudgment interest on his open hay claim. This time the district court granted Ray's motion, finding the entry of the first amended judgment restarted the time to file post-trial motions, thus his motion was timely and Ray was entitled to prejudgment interest under Idaho Code section 28-22-104(1). The district court entered a second amended judgment reflecting this ruling on January 23, 2019.

Ray and Choice Feed both petitioned the district court for an award of costs and attorney fees under Idaho Code section 12-120(3) on the same basis: that the litigation involved a

10

commercial transaction and that the prevailing party is entitled to an award of reasonable attorney fees. The district court determined that Choice Feed was the prevailing party. The district court looked to Idaho Rule of Civil Procedure 54(d)(1)(B) and considered: (1) the final judgment or result obtained in relation to the relief sought; (2) whether there were multiple claims or issues between the parties; and (3) the extent to which each of the parties prevailed on each of the claims or issues. The district court reviewed each claim and reasoned that most of Choice Feed's claims were resolved as a result of the successful mediation with Gary. The district court also recognized that Choice Feed was successful on its claim of fraud in count 5, was awarded punitive damages, and successfully defended against Ray's counterclaim of fraud. The district court further noted that Ray was successful in defending against Choice Feed's claim of fraud in count 4 and his counterclaim for the open hay account. In the end, the district court reasoned that Choice Feed's overall success in establishing fraud and receiving punitive damages outweighed Ray's success in his hay claim and in defending Choice Feed's additional fraud claim.

Upon finding that Choice Feed was the prevailing party, the district court turned to the amount of attorney fees. It noted that attorney fees were awarded at its discretion and it considered each factor under Idaho Rule of Civil Procedure 54(e)(3). The district court recognized: (1) the length of time the case required between pre-trial motions, an eight day jury trial, and post-trial motions; (2) the difficult and multiple issues of the case; (3) the complexity of the case which required advanced litigation and trial skills; (4) each party's billable hours and rates were reasonable; (5) the contingent fee or hourly rate charged by each party's attorney; (6) neither party imposed time limitations; (7) Choice Feed claimed the amount involved was $1,250,000 – the purchase price of the feedlot – but they obtained significantly less after trial; (8) the undesirability of Choice Feed's case because of its complex nature; (9) the nature of the relationship between Choice Feed and its attorney; and (10) the fees awarded in similar cases, notwithstanding the uniqueness of this case.

Choice Feed requested an attorney fee award of $437,832.15. The district court found that amount reasonable for the work performed, but reduced it because Choice Feed was not completely successful on all of its claims. The district court, therefore, awarded Choice Feed

$325,000 in attorney fees[6] and costs in the amount of $7,851.97. Choice Feed timely filed a notice of cross-appeal.

## II. STANDARD OF REVIEW

Due to the number of issues, each having its own standard of review, the standard of review for each issue will be discussed at the beginning of its respective section.

## III. ANALYSIS

### A. Choice Feed has standing inasmuch as it is the real party in interest.

Ray asserts that Choice Feed did not have standing to sue him because Choice Feed was not actually a party to the alleged contract since only KPT was listed in the draft agreement. Choice Feed argues that there was no adverse ruling from the district court for this Court to review and, therefore, this Court should not address Ray's claim.

A litigant can challenge whether a party has standing to sue at any time. *Tungsten Holdings, Inc. v. Drake*, 143 Idaho 69, 72, 137 P.3d 456, 459 (2006). This includes raising it for the first time on appeal. *Campbell v. Parkway Surgery Center, LLC*, 158 Idaho 957, 961-62, 354 P.3d 1172, 1176-77 (2015). Standing focuses on the party seeking relief and not the issues to be adjudicated. *Bagley v. Thomason*, 149 Idaho 806, 807, 241 P.3d 979, 980 (2010). To satisfy standing, "a litigant must allege an injury in fact, a fairly traceable causal connection between the claimed injury and the challenged conduct, and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." *Sec. Fin. Fund, LLC v. Thomason*, 153 Idaho 343, 347, 282 P.3d 604, 608 (2012).

Ray's standing arguments more accurately translate into an assertion that Choice Feed is not the real party in interest. As counsel for Choice Feed aptly noted, the essence of Ray's argument is that he did not know the true identity of the party he was defrauding. A lawsuit must be brought by the "real party in interest." *Citibank (South Dakota), N.A. v. Carroll*, 148 Idaho 254, 257, 220 P.3d 1073, 1076 (2009) *see also* I.R.C.P. 17(a). "A real party in interest is 'one who has a real, actual, material, or substantial interest in the subject matter of the action.' " *Id.* (quoting *Caughey v. George Jensen & Sons*, 74 Idaho 132, 134-35, 258 P.2d 357, 359 (1953)). "The main purpose of the real-party-in-interest rule is to ensure that the defendant will not be

---

[6] The district court also awarded Choice Feed supplemental attorney fees of $553.00 for additional work performed on the post judgment matters.

subjected to multiple obligations, and that the party bringing the action has the ability to protect the defendant from subsequent suits concerning the same obligation. *Id.* at 258, 220 P.3d at 1077.

Here, Choice Feed clearly has a "real, actual, material, and substantial interest" in the subject matter of this action. Choice Feed bargained for the sale of the feedlot, relied on Ray's misrepresentations, paid Ray extra money for the purchase of the feedlot, and made improvements to the feedlot based on Ray's misrepresentations, regardless of the entity's name appearing on the unsigned contract. The fact that the transaction never took place injured Choice Feed—not KPT. It was Choice Feed that spent extra money each month paying Ray, making improvements to the feedlot, and in the end, was unable to purchase the feedlot from Ray. More importantly, Ray's fraudulent actions prevented KPT—an LLC solely formed to operate the feedlot *for* Choice Feed *after* the sale was consummated—from ever becoming "a real party" or "acquiring an interest." Choice Feed was clearly the real party in interest to bring this suit because it suffered injuries which were causally connected to Ray's actions to give Choice Feed standing.

### B. Proof of a sale or transfer of property is not an element of fraud.

Ray asserts that because there was no actual sale or transfer of property, it precluded the jury from finding he had committed fraud. He supports his argument with no authority and asks this Court to find, as an issue of first impression, that fraud is not a viable cause of action when there has been no exchange, sale, or transfer of property. Ray essentially asks this Court to add a tenth element to the existing nine elements of common law fraud. We decline Ray's invitation.

In support of his position, Ray quotes a California appellate case:

[A] claim of fraud cannot be permitted to serve simply as an alternative cause of action whenever an enforceable contract is not formed. Accordingly, in order to support a claim of fraud based upon the alleged failure to perform a promise, it must be shown that the promissor did not intend to perform at the time the promise was made. (*Tenzer v. Superscope, Inc.,* (1985) 39 Cal.3d 18, 30, 216 Cal.Rptr. 130, 702 P.2d 212.) Although it has been suggested that failure to perform a promise is sufficient to prove fraud, "[t]his is not, and has never been the law," and "if plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he [should] never reach a jury."

*Conrad v. Bank of America*, 45 Cal. App. 4th 133, 156-57, 53 Cal.Rptr.2d 336, 351-52 (1996). This California case – or more specifically the above quotation on which Ray relies – does not support his argument to add an element to common law fraud cause by requiring a completed transfer of property.

'To say that *all* fraudulent misrepresentation must fit within *Faw's*[7] nine-element formulation misconstrues the very nature of fraud. 'Fraud vitiates everything it touches. It is difficult to define; there is no absolute rule as to what facts constituted [sic] fraud; and the law does not provide one 'lest knavish ingenuity may avoid it.' *Massey Ferguson, Inc. v. Bent Equipment Company*, 283 F.2d 12, 15 (5th Cir. 1960). '[T]he law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity.' *Id.*'

*Tusch Enterprises v. Coffin*, 113 Idaho 37, 41 n.1, 740 P.2d 1022, 1026 n.1 (1987); *see also Weiss v. U.S.*, 122 F.2d 675, 681 (5th Cir. 1941), *cert. denied,* 314 U.S. 687 (1941). Ray would have us hold that there can be no fraud unless Choice Feed (or KPT) actually received possession of the feedlot and later discovered that its value was less than represented. However, fraud cannot be contained to those specific facts. Fraud, by its very nature, is capable of appearing in many nebulous forms and employing more cunning stratagems than the wisest judges and policy makers can possibly foresee. As this case effectively demonstrates, it can certainly occur without a completed sale or transfer of property. The standard and burden of proof for establishing fraud is already very high; therefore, we see no reason to impose an additional artificial restriction a tenth element. Accordingly, we reject Ray's argument that a completed sale or transfer is a prerequisite for proving common law fraud.

**C. The district court did not err by denying Ray's motion to dismiss because Choice Feed pleaded fraud with sufficient particularity.**

Ray contends that the district court erred by denying his pretrial motion to dismiss because Choice Feed failed to plead their fraud claim with particularity, as required by Rule 9(b). We concur with the district court's analysis that this argument lacks merit.

When this Court reviews a denial of a Rule 12(b)(6) motion to dismiss, it employs the same standard of review as that of summary judgment. *Garcia v. Pinkham*, 144 Idaho 898, 899, 174 P.3d 868, 869 (2007). " 'After viewing all facts and inferences from the record in favor of the non-moving party, we will ask whether a claim for relief has been stated.' " *Id.* (quoting *Rohr v. Rohr*, 128 Idaho 137, 141, 911 P.2d 133, 137 (1996)). To state an actionable claim for fraud, a plaintiff must allege each of the nine elements of fraud with particularity:

(1) a statement or representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge about its falsity or ignorance of its truth; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the

---

[7] *Faw v. Greenwood*, 101 Idaho 387, 613 P.2d 1338 (1980).

14

statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury.

*Budget Truck Sales, LLC v. Tilley*, 163 Idaho 841, 847, 419 P.3d 1139, 1145 (2018).

While Ray agrees that the elements of fraud that relate to intent, knowledge, and other conditions of a person's mind may be alleged generally in a complaint, he asserts that the remaining elements were not pleaded with particularity. I.R.C.P. 9(b).

Ray relies on our *Dengler* decision to support his position. In *Dengler*, a trust owned real property in Boise. The trustee of the trust entered into an agreement with the Denglers to sell this property on the condition that an easement would be obtained to the landlocked property; however, an easement could not be obtained. The trust then sold the property to the city of Boise and the Denglers filed a complaint asserting that an enforceable agreement still existed. The Denglers asserted fraud as one of their causes of action and the trust filed a motion for summary judgment asserting, *inter alia*, that the fraud claim had not been pleaded with particularity under Idaho Rule of Civil Procedure 9(b) and 12(b)(6). The district court granted the trust's motion. *Dengler*, 141 Idaho at 125-26, 106 P.3d at 451-52.

On appeal, this Court affirmed the decision of the district court, finding "[t]he complaint fails to allege anything other than the elements of the prima facie case of fraud." *Id.* at 128, 106 P.3d at 454. A review of the Denglers' complaint demonstrates that they merely recited the bare elements of fraud and simply substituted the trustee's name:

- That [trustee] made statements, representations and conducted himself in a manner that he has apparent authority to conduct the sale of the property.
- That such statements, representations, and conduct were false.

. . . .

- That Plaintiffs acted reasonably by relying on [trustee's] statements, representations and conduct.
- That Plaintiffs were damaged by his statements, representations, and conduct.
- [Trustee's] statements, representations, and conduct caused said damage.
- The amount of said damage will be determined at trial.

On the other hand, Choice Feed's second amended complaint contained specific and particular allegations to satisfy the particularity requirement:

103. After [Ray] received the draft documents he made the factual representation that he was waiting to sign the contract until he could arrange for a 1031 tax deferred exchange so that he could defer any taxes due from the sale of the feedlot.

15

104. [Ray] made this representation to Doug Mikelson by telephone and in person from September 2014 through June 2015, including twice in the Spring of 2015 when he delivered monthly purchase payments to [Ray].

105. [Ray] continued to make this misrepresentation to Paul Mikelson in person including once at the Feedlot office, once and the tack room and once in Caldwell.

106. The representation was false.

107. The representation was material.

. . . .

112. Choice Feed's reliance was reasonable under the circumstances.

113. Choice Feed suffered damages proximately caused by reliance on [Ray's] false statements in an amount to be proven at trial.

The meager factual allegations in *Dengler* are easily distinguishable from those in the case at hand. Notably, the plaintiffs in *Dengler* did not specifically allege anything to satisfy the third element of fraud – materiality. Choice Feed, on the other hand, provided the type of particularized allegations of fraud that were lacking in *Dengler*. For example, Choice Feed specified the substance of the representation that was made, when it was made, by whom it was made, to whom it was made, and how it was made. Specifically, Choice Feed pleaded that Ray made false representations that he would complete the agreement once he arranged a 1031 exchange. He made this representation to multiple members of Choice Feed throughout 2014 and 2015. The plaintiffs in *Dengler* only generally alleged that the trustee made "statements and representations."

Rule 9(b) clearly exists to put defendants on fair notice of the precise nature of the fraud alleged. In this case, it cannot be seriously argued that Ray lacked notice as to what he did and why he was being sued for it. Considering all inferences from the record in a light most favorable to Choice Feed's favor, we affirm the district court's ruling that Choice Feed pleaded fraud with enough particularity regarding the circumstances constituting fraud to provide Ray adequate notice. Therefore, we affirm the district court's denial of Ray's motion to dismiss.

**D. The district court did not err in conforming Choice Feed's pleadings to the evidence presented at trial by modifying the jury instruction regarding fraud.**

Ray argues on appeal that the district court erred by correcting Choice Feed's allegedly deficient allegation of fraud in the second amended complaint by giving the jury an instruction that conformed to the evidence. Choice Feed asserts that the jury instruction merely clarified the pleadings to conform to the evidence presented at trial; thus, it did not mislead the jury, and was not an erroneous statement of law.

16

This Court exercises free review over the propriety of jury instructions. *Hennefer v. Blaine Cnty. Sch. Dist.*, 158 Idaho 242, 253, 346 P.3d 259 (2015). "The standard for whether a particular instruction 'should or should not have been given is whether there is evidence at trial to support the instruction, and whether the instruction is a correct statement of the law.' " *Id.* (quoting *Mackay v. Four Rivers Packing Co.,* 151 Idaho 388, 391, 257 P.3d 755, 758 (2011)).

Below, Ray made the narrow argument that paragraph 103 in Choice Feed's second amended complaint should dictate the proposed jury instruction. Paragraph 103 of Choice Feed's count 5 fraud claim alleged:

> After [Ray] received the draft documents he made the factual representation that he was waiting to sign the contract until he could arrange for a 1031 tax deferred exchange so that he could defer any taxes due from the sale of the feedlot.

The district court removed the temporal scope and added the fact that Ray made the representation to multiple members of Choice Feed. The final jury instruction provided:

> That Ray stated a fact to Choice Feed or to one or more of Choice Feed's principal owners that he was waiting to sign the contract until he could arrange for a 1031 tax deferred exchange so that he could defer any taxes due from the sale of the feedlot.

On appeal, Ray repeats this same argument, but also adds that the rest of the jury instruction on Choice Feed's count 5 is also erroneous because of the revisions from Choice Feed's complaint. Because these arguments regarding the remainder of the jury instruction were not made below, this Court will not consider them. Appellate courts do not consider new arguments raised for the first time on appeal. *Obenchain v. McAlvain Const., Inc.*, 143 Idaho 56, 57, 137 P.3d 443, 444 (2006). "Appellate court review is 'limited to the evidence, theories and arguments that were presented . . . below.' " *Id.* (quoting *State v. Vierra*, 125 Idaho 465, 469, 872 P.2d 728, 731 (Idaho App. 1994)).

The district court's proposed instruction was not an erroneous statement of the law and it reflected the evidence presented at trial. At trial, Choice Feed showed that Ray made the representation at issue to multiple Choice Feed principals—*i.e.*, that he would complete the deal after he arranged a 1031 exchange. He made this representation before he received the draft agreement at their meeting in early September 2014 and later repeated the representation after he received the draft agreement.

17

Ray also contends that if the jury instructions are permitted to conform to the evidence at trial, it vitiates the requirement to plead fraud with particularity. "[Choice Feed's] position would allow a party to plead whatever it wanted for fraud no matter how deficient, put on evidence at trial, and then have the pleading amended sua sponte at the last minute after evidence is closed." However, Ray fails to recognize that Idaho Rule of Civil Procedure 15(b) generally allows for such amendments: "If, at trial, a party objects that evidence is not within the issues raised in the pleadings the court may permit the pleadings to be amended. . . . when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits."

It is fatal to Ray's argument that he neither (1) contends that he objected to any of the evidence presented by Choice Feed at trial on the grounds that it was allegedly outside the scope of the pleadings, nor (2) explains how the form of the instruction given to the jury prejudiced him on the merits. Therefore, we conclude that the district court acted within its discretion in giving a jury instruction that conformed to the evidence presented at trial.

### E. Choice Feed established the elements of fraud at trial.

Ray asserts on appeal that the jury could not have returned a verdict for Choice Feed on its fraud claim in count 5 because Choice Feed failed to prove each and every element of fraud at trial. Jury verdicts will not be overturned when they are supported by substantial and competent evidence. *Vanderford Co., Inc. v. Knudson*, 144 Idaho 547, 552, 165 P.3d 261, 266 (2007). Substantial evidence does not have to be uncontradicted evidence. *Id.* When examining substantial evidence, this Court draws all inferences " 'in the light most favorable to the non-moving party' and view[s] the facts as if the moving party has admitted the truth of all the non-moving [party's] evidence." *Id.* (quoting *Jeremiah v. Yanke Mach. Shop, Inc.*, 131 Idaho 242, 247, 953 P.2d 992, 997 (1998)). This Court will not disturb a verdict when there is substantial evidence of " 'sufficient quantity and probative value that reasonable minds could conclude the verdict of the jury was proper.' " *Id.* (quoting *Karlson v. Harris*, 140 Idaho 561, 567, 97 P.3d 428, 434 (2004)). Any conclusions of law are reviewed freely by this Court. *Id.*

We have already discussed the nine elements of fraud. Once again, Choice Feed had to prove each of the following elements by clear and convincing evidence:

> To establish fraud or misrepresentation, a party must prove each of the following elements: (1) a statement or representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge about its falsity or ignorance of its truth;

18

(5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury.

*Budget Truck Sales*, 163 Idaho at 847, 419 P.3d at 1145 (2018). In addressing this challenge to the jury verdict, we must then determine whether substantial and competent evidence existed in the trial record so that reasonable minds could conclude the jury's verdict was proper. Each element of fraud is addressed in turn.

### 1. *Ray made false representations (Elements 1 and 2).*

Generally, an alleged fraudulent representation must concern past or existing material facts. *April Beguesse, Inc. v. Rammell*, 156 Idaho 500, 509, 328 P.3d 480, 489 (2014). " '[A] representation consisting of promise or a statement as to a future event will not serve as basis for fraud, even though it was made under circumstances as to knowledge and belief which would give rise to an action for fraud had it related to an existing or past fact.' " *Id.* at 510, 328 P.3d at 490 (quoting *Sharp v. Idaho Inv. Corp.*, 95 Idaho 113, 122, 504 P.2d 386, 395 (1972)). One exception to the general rule is " 'where a false prediction or opinion is given with the intent to mislead.' " *Id.* (quoting *Country Cove Dev., Inc. v. May*, 143 Idaho 595, 601, 150 P.3d 288, 294 (2006)). Essentially, this exception applies where a speaker makes a promise to induce action on the part of the promisee without any intent to keep the promise. *Id.*

In this case, viewing the evidence in the light most favorable to Choice Feed and viewing it as if Ray admitted the truth of all of Choice Feed's evidence, there was substantial evidence for a reasonable jury to conclude that Ray made a promise to induce action without intending to keep it and that his representations were false. For example, at Ray's first meeting with Trent in July 2014, Ray asserted his need to use a 1031 exchange in order to sell the feedlot. At the subsequent meeting on September 2, 2014, Doug told Ray that if they could not purchase the feedlot, they would move. Choice Feed again offered to purchase the feedlot in installments, and although Ray mentioned a 1031 exchange, Ray accepted Choice Feed's installment payments. Choice Feed reasonably believed at that point it had a deal to purchase the feedlot. After Ray received the draft agreement in November 2014, Ray did not vocalize any objections, but merely stated he was waiting to put together a 1031 exchange. Ultimately, Ray never arranged a 1031

19

exchange.[8] Furthermore, when Ray spoke with Paul at the feedlot on April 29, 2015, he had already agreed to sell the feedlot to Gary. Yet, when Paul expressed doubt about whether Ray would get the deal finalized, Ray told him that the 1031 exchange could still occur if Choice Feed obtained an appraisal, financials, tax returns, and a broker's opinion on the feedlot. The evidence showed the jury the falsity of these continued representations and assurances, which were clearly intended to string Choice Feed along until Ray could get a better deal. Thus, a rational jury could reasonably find that Ray's promise to sell the feedlot after he put together a 1031 exchange was intended to induce Choice Feed to remain on the feedlot and to continue paying him rent, all while it maintained and improved the feedlot, until he found another buyer.

### 2. *Ray's false representations were material to Choice Feed (Element 3).*

" 'Materiality refers to the importance of the misrepresentation in determining the plaintiff's course of action.' " *Watts v. Krebs*, 131 Idaho 616, 619, 962 P.2d 387, 390 (1998) (quoting *G & M Farms v. Funk Irrigation Co.*, 119 Idaho 514, 521, 808 P.2d 851, 858 (1991)). Here, the evidence in the record supports the jury's conclusion that Ray committed fraud.

Choice Feed made it very clear to Ray at their meeting in early September 2014 that if it could not purchase the feedlot, it would not make the necessary improvements and would vacate the premises. Because Choice Feed was on a month to month lease, this could have left the feedlot without a tenant, and without a monthly income stream to Ray, very quickly and for a considerable time. Also, it is likely Ray would have had to make the necessary improvements out of his own pocket in order to get a new tenant for the feedlot, or Ray would have had to sell the feedlot for a substantial discount. Ray's representation was material because it led Choice Feed to believe it had a deal to purchase the feedlot; therefore, it immediately began to pay for the necessary improvements and did not vacate, thereby ensuring Ray would have a continuous income stream and a maintained lot to sell. Ray also accepted Choice Feed's additional installment payments – explicitly referenced on each check to be allocated toward the purchase of the feedlot. A reasonable juror could find that Ray's statement that he was waiting to arrange a 1031 exchange kept Choice Feed on the hook and gave him time to arrange another deal. Ray's statements and assurances were clearly material to the transaction and to Choice Feed because without them, the record supports the conclusion that Choice Feed likely would have vacated the

---

[8] Interestingly, Ray asserted that he continually looked for an investor with an all cash offer to complete a three-way 1031 exchange. However, Ray presented no evidence that he ever discussed or presented this type of deal with Gary – who purchased the feedlot with an all cash offer.

feedlot, ceased making any improvements, and stopped paying rent. Ray's false statements drove and dictated Choice Feed's actions, which makes those representations material.

### 3. *Ray knew his representations were false and he intended Choice Feed to rely on his false representations (Elements 4 and 5).*

Viewing the evidence in a light most favorable to Choice Feed, a rational jury could have reasonably found that Ray knew his representations were false and Ray made the representations in hope that Choice Feed would rely upon them. The evidence for this element is overwhelming and came from Ray himself when he admitted that he knew Choice Feed believed it was making the extra payments toward the purchase of the feedlot, but he was accepting them for another reason. Ray stated: "I'm not saying that's why they paid it, but it's part of the reason I was willing to accept it." Moreover, when another buyer came along with a cash offer, Ray did not work out the three-way 1031 exchange he had discussed with Choice Feed. Instead, he sold the feedlot out from under Choice Feed without notice. Even after Ray had already agreed to sell the feedlot to Gary, he continued to falsely tell Paul that the deal with Choice Feed could still be finalized. A rational jury could have also concluded that Ray intended Choice Feed to rely on these representations. As Choice Feed made clear to Ray, it was going to leave the feedlot if it could not purchase and own it. If Ray told Choice Feed he did not want to sell the feedlot under those terms, Choice Feed would have left immediately. However, if Ray told Choice Feed that he would complete the deal as soon as he arranged a 1031 exchange, it would keep Choice Feed on the lot, paying rent, and making improvements until Ray could find another buyer. That is exactly what Ray did. A reasonable jury could conclude there was evidence that Ray never intended to sign the draft agreement with Choice Feed, but opted to keep it paying rent, making improvements, and occupying the feedlot until he arranged a more advantageous sale.

### 4. *Choice Feed did not know Ray's representations were false (Element 6).*

In an attempt to demonstrate that Choice Feed knew Ray's representations were false, Ray focuses on Paul's testimony about their meeting on the feedlot where Paul asked Ray if they were going to get the three-way 1031 exchange completed and Ray told him probably not. However, Ray ignores the totality of his own testimony: that he and Paul continued to talk about the sale after Ray's "probably not" statement. The record shows that Ray did not shut the deal down completely at that point but suggested to Paul that they could get another party with money to participate in a 1031 exchange if they obtained financials, tax returns, and a broker's opinion

21

on the value of the feedlot. The jury could have reasonably concluded that Choice Feed could not have known the falsity of Ray's statement because he kept the option alive by giving Choice Feed hope a deal could still be completed. Indeed, Choice Feed's testimony was clear – if it could not buy the feedlot, it was going to leave. The fact that Choice Feed continued to operate the feedlot shows that it believed it still had an agreement to purchase the feedlot. Again, the jury could have reasonably concluded that it is unlikely that Choice Feed would have made all of the improvements and continued to pay Ray extra money if it had known Ray was lying about selling it the feedlot.

### 5. *Choice Feed relied on Ray's representations and its reliance was justifiable (Elements 7 and 8).*

Ray argues that Choice Feed did not rely on Ray's statements because Choice Feed knew Ray would not sign the draft agreement. While Choice Feed conceded that the version of the agreement expressed in the draft agreement may not have been identical to the terms of the final agreement Ray would eventually sign, Ray makes too much of this specific concession. Choice Feed testified while the draft agreement may not have been signed exactly as drafted because of slight alterations, a contract would be signed once Ray arranged the 1031 exchange. A reasonable jury could conclude that Choice Feed relied on Ray's statements and assurances, which is why it remained on the feedlot. It goes against the evidence presented at trial and common sense to believe Choice Feed somehow knew the deal was off, yet continued to make improvements to the feedlot and pay Ray extra money each month out of sheer good will. Choice Feed carried out these actions because it relied on Ray's representations that it had a deal to purchase the feedlot as soon as Ray arranged a 1031 exchange.

Instead of focusing on his own misleading representations, Ray chooses to fixate on KPT being named in the draft agreement as the buyer and arguing that Choice Feed's reliance was, therefore, somehow unreasonable. Ray's argument is unavailing. At trial, the jury heard clear and convincing testimony that KPT was the entity Choice Feed was forming to purchase and hold the feedlot. Ray presented no other evidence to the contrary. A jury could find Choice Feed reasonably relied on Ray's statements that he was waiting on a 1031 exchange in order to finalize the sale inasmuch as Ray continually made such statements and accepted additional payments.

### 6. *Choice Feed suffered damages (Element 9).*

22

" 'In order to secure relief on a basis of fraud, the party seeking redress must have been damaged, injured or harmed as a result of the asserted fraud. A false representation which causes no loss is not actionable.' " *Rammell*, 156 Idaho at 510, 328 P.3d at 490. Ray asserts that the extra $3,877.56 Choice Feed paid to Ray each month was not a result of his alleged fraud, but for a possible agreement to purchase the feedlot. Ray also reiterates his earlier argument that KPT, not Choice Feed, is the party that suffered damages.

We have already rejected Ray's latter argument, as we earlier explained that Ray's argument is more closely aligned with an argument about the real party in interest. The testimony was clear that KPT was an entity Choice Feed intended to create to hold the feedlot on its behalf. Ray presented no contradictory evidence or testimony.

As to any damages being unconnected to the fraud, Choice Feed suffered damages by relying on Ray's false representations. Based on his representations, Choice Feed made nine installment payments for the feedlot. Choice Feed understood that the extra money included with the rent would go toward the purchase of the feedlot. The memo line on each check referenced the purchase of the feedlot, and Ray cashed every check. Choice Feed made clear to Ray that it were not going to stay unless it was purchasing the feedlot. Ray's self-admitted ulterior motive in accepting the payments, however, was to take Choice Feed's extra money as payment for an outstanding hay bill with no intention of applying any of it towards the purchase of the feedlot. Again, Ray's statement—"I'm not saying that's why they paid it, but it's part of the reason I was willing to accept it."—could hardly be a more obvious and transparent disclosure of his fraudulent intent. Moreover, after Ray sold the feedlot to Gary, he did not tell Choice Feed that the deal was off, but continued to collect its money, all the while reassuring it a deal was still in the works. A reasonable jury could easily conclude that Choice Feed was injured by making additional payments for the feedlot, continuing to maintain the feedlot, and paying for improvements to the feedlot. These damages were all the direct result of Ray's representations that he would sell the feedlot to Choice Feed.

In sum, after viewing the evidence in the light most favorable to Choice Feed, this Court finds that there was substantial and competent evidence in the record upon which a reasonable jury could determine that Choice Feed established all nine of the elements of fraud at trial.

**F. The district court did not err by allowing Choice Feed to seek the cost of improvements made to the feedlot as damages at trial.**

Initially, Ray contends the district court erred by allowing Choice Feed to seek the cost of improvements as damages after Choice Feed initially stated it was not going to seek those damages earlier in the case. Ray alternatively argues that Choice Feed was not entitled to the improvements as damages because under the lease Choice Feed assumed from Floyd, Choice Feed was first required to obtain permission from Ray and it did not.

"When reviewing the trial court's evidentiary rulings, this Court applies an abuse of discretion standard." *State v. Hayes*, 166 Idaho 646, 462 P.3d 1110, 1117 (2020). In determining whether a trial court has abused its discretion, we apply a four-prong test: whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 867, 421 P.3d 187, 198 (2018).

First, Ray's initial argument that Choice Feed waived its right to seek improvement damages was untimely when made to the district court. During the April 4, 2018, status conference, after the district court denied Choice Feed's "benefit of the bargain" fraud damages theory (count 4), Choice Feed clarified that it would now be seeking improvement damages as out of pocket expenses. This was a change from the earlier statement in its briefing that it was not seeking improvement damages; however, it was consistent with Choice Feed's statement made on the record in January of 2018 that if the district court denied its benefit of the bargain damages theory, Choice Feed would seek the improvement damages under the out of pocket theory. Ray objected and argued against the damages, asserting that he had no notice of the total amount of improvement damages Choice Feed was claiming. He also argued that the disclosure was too late for him to respond to at trial. Ray *did not* argue that Choice Feed had waived and relinquished its right to seek those damages.

The day after the status conference, the district court announced its ruling from the bench, holding that those particular damages had been under consideration throughout the case and had been the subject of previous discovery. The court found that Choice Feed would be prejudiced if it could not present improvement damages at trial, after the district court denied Choice Feed's other requested theory of damages, and this theory of damages was not a surprise or a new theory to Ray. The Court explained its ruling from the bench as follows:

This is an issue where those particular damages have been under consideration for extensive period of time. Discovery's been conducted on it because this Court has had to address problems dealing with the discovery issues. The Plaintiff's expression of intent not to pursue those has been relatively recently, and I think in January of 2018. This case has been pending nearly three years. It's set to commence trial next Monday. And I want to have the matter tried for the benefit of the parties and all the court personnel and everybody involved.

Albeit, I think it's probably imprudent for the plaintiffs to indicate they were not going to go further with this evidence in light of its alternative theories of fraud damages or at least to have stated that it was contingent if the Court ruled in their favor, nonetheless, the Court recognizes this is an issue of discretion in the exercise of reason by this Court. It's an issue dealing with the allowance of what evidence will be allowed to be presented at trial.

The defendants have articulated they feel that they'd be prejudiced because they have not continued to prepare defending that action and it put them under, basically, the gun to try to prepare to defend that over the next few days with trial starting Monday.

Plaintiffs will be prejudiced if I do not allow the evidence because they're going to go through a trial and not be able to put on all the evidence they have regarding possible damages that the plaintiffs may have suffered under the limitations allowed by this Court in its decision as to the model for damages.

. . . .

It is not total surprise evidence. If it was a completely new and unexplored issue of possible damages, the Court might be more inclined to now [*sic*] allow it to be presented. But this is something [that] has been at issue in this case for a considerable period of time. Discovery's been conducted on it. It's been contemplated. There was preparation for it prior to the January jury trial which this Court vacated.

Only after this ruling did Ray *then* make his argument that Choice Feed had waived and relinquished its right to claim these damages. While the district court did not have an opportunity to hear and make a reasoned ruling on Ray's argument before rendering its decision and Ray did not make a motion for reconsideration, Ray still made this argument before trial commenced. However, we find whatever error in the district court's failure to specifically address the waiver issue is harmless because its analysis still stands.

Choice Feed's improvement damages had been a constant issue pre-trial. There had been extensive discovery conducted on them and Ray knew about this possible damages theory. Therefore, it was not a total surprise to Ray. Choice Feed had stated in January of 2018 that it would seek these damages if the district court denied its proposed alternative damages theory, and Choice Feed would be severely prejudiced at trial because it could not put on evidence it had regarding all of its damages suffered. The district court's discretionary evidentiary decision was

25

thoughtfully made and well-reasoned even though it was made close to trial. There was no abuse of discretion here.

Second, Ray asserts that Choice Feed was not entitled to improvement damages at trial because Choice Feed assumed the lease from Floyd and the lease required all improvements to receive approval from Ray before they are made. This argument is also unavailing.

Choice Feed advised Ray multiple times during their negotiations that the feedlot was in dire need of improvements. Choice Feed logically represented that it was not going to make and pay for the improvements if it could not purchase and own the feedlot. Instead, Choice Feed would find a new feedlot to operate. In response to these assertions, Ray stated, "[w]ell, okay." Furthermore, there was testimony and evidence presented at trial that Ray visited the feedlot on a regular basis between September 2014 and June 2015 and should have been aware of the improvements. Ray never presented evidence that he objected to or confronted Choice Feed about the improvements it was making. Because Ray was aware of the improvements and did not object to them, the most reasonable inference from the record is that he acquiesced to them.

Idaho Courts have recognized the "out-of-pocket" rule in measuring damages for a fraud cause of action. *Rammell*, 156 Idaho at 511, 328 P.3d at 491. "The out-of-pocket rule 'limits the recovery of damages to the difference between' the real value of the thing actually received 'and the price paid or contracted for.' " *Id.* (quoting *Walston v. Monumental Life Ins. Co.,* 129 Idaho 211, 217, 923 P.2d 456, 462 (1996)). " 'The underlying principle is that the victim of fraud is entitled to compensation for every wrong which is the natural and proximate result of fraud.' " *Id.* (quoting *Weitzel v. Jukich*, 73 Idaho 301, 308, 251 P.2d 542, 546 (1952)). The evidence at trial showed that Choice Feed paid for a substantial amount of improvements to the feedlot, in reliance on Ray's fraudulent conduct, and Choice Feed did not receive its anticipated return from its improvements. Therefore, it was not an abuse of discretion for the district court to allow Choice Feed to claim improvement expenses as out of pocket damages at trial because Ray was aware of the improvements and acquiesced to them.

**G. The district court erred by granting Ray's JNOV motion and reducing the compensatory damage award.**

Choice Feed contends on its cross-appeal that the district court erred by granting Ray's JNOV motion and reducing the jury's compensatory damage award. Choice Feed argues that

26

there was substantial evidence to support an award of fraud damages from September 2, 2014, through November 6, 2014. We agree, but on different grounds.

This Court reviews a decision to grant or deny a JNOV motion using the same standard the district court applied. *Rammell*, 156 Idaho at 509, 328 P.3d at 489.

> A jury verdict must be upheld if there is evidence of sufficient quantity and probative value that reasonable minds could have reached a similar conclusion to that of the jury. In reviewing a grant or denial of a motion for JNOV the court may not reweigh the evidence, consider witness credibility, or compare its factual findings with that of the jury. The court reviews the facts as if the moving party had admitted any adverse facts, drawing reasonable inferences in favor of the non-moving party.

*Id.* (quoting *Athay v. Rich Cnty.*, 153 Idaho 815, 825, 291 P.3d 1014, 1024 (2012)).

The jury awarded compensatory damages for expenses incurred from September 2014 through May 2015 on Choice Feed's count 5 claim of fraud. Choice Feed alleged in its second amended complaint:

> After [Ray] received the draft documents he made the factual representation that he was waiting to sign the contract until he could arrange for a 1031 tax deferred exchange so that he could defer any taxes due from the sale of the feedlot.

> [Ray] made this representation to Doug Mikelson by telephone and in person from September 2014 through June 2015, including twice in the Spring of 2015 when he delivered monthly purchase payments to [Ray].

> [Ray] continued to make this misrepresentation to Paul Mikelson in person including once at the feedlot office, once at the room and once in Caldwell.

Choice Feed argues that it alleged Ray made the misrepresentation long before he received the draft agreement and viewing the evidence in the light most favorable to it, the jury verdict should be upheld. However, the district court condensed Choice Feed's aforementioned allegations to the following singular jury instruction:

> That Ray stated a fact to Choice Feed or to one or more of Choice Feed's principal owners that *he was waiting to sign the contract* until he could arrange for a 1031 tax deferred exchange so that he could defer any taxes due from the sale of the feedlot.

(Emphasis added). In granting Ray's JNOV motion, the district court reasoned that the above emphasized language in the final jury instruction limited Choice Feed's recovery to the period of time *after* Ray received the draft agreement through the point at which Choice Feed knew Ray

27

sold the feedlot to Gary. We find this temporal limitation on recovery imposed by the district court to be contrary to the evidence presented at trial.

Although the jury instruction contains language that implies Ray's misrepresentations only occurred *after* he received the draft agreement, the evidence at trial showed otherwise. Ray's fraud began with the meeting with Choice Feed in early September when he agreed to take extra money in rent to go toward the purchase of the feedlot. From the beginning, Ray misrepresented that he would wait to finalize the deal until he could arrange a 1031 exchange. Ray's earlier misrepresentations merely evolved after he received the draft agreement. The only difference after the draft agreement was delivered is that Ray changed his phrasing and said he would sign the draft agreement once he arranged a 1031 exchange. Ray's fraudulent conduct continued through the following spring when, after he already agreed to sell the feedlot to Gary, Ray told Paul that they could still finalize a deal by getting appraisals, financials, and a broker's opinion of the feedlot. In the end, Ray admitted that he was taking Choice Feed's money to pay its hay debt, not to go toward the purchase of the feedlot. The jury found in favor of Choice Feed and damages stemming from their meeting in September 2014. The jury clearly understood Ray's shifting misrepresentations and did not limit the damages temporally. The district court erred by disregarding the substantial evidence presented and altering the jury's reasonable conclusion as to the amount of damages.

**H. The district court correctly submitted the issue of punitive damages to the jury, but it erred by reducing them.**

Ray makes multiple arguments regarding punitive damages. He argues that the jury's award of punitive damages was not supported by the evidence, the amount assessed was unconstitutional, this case does not further the purpose of punitive damages, and even if appropriate, the punitive damages should be awarded to KPT, not Choice Feed, as KPT suffered the injury. Choice Feed cross-appeals the district court's decision to grant Ray's JNOV motion and reduce the punitive damages award. We will address the arguments in turn.

Regarding punitive damages, the proper standard of review for this Court is to initially determine whether the district court abused its discretion by allowing the jury to consider an award of punitive damages. *Alexander v. Stibal*, 161 Idaho 253, 260, 385 P.3d 431, 438 (2016). To determine whether the district court abused its discretion, this Court applies a four-prong test: whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the

28

outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg,* 163 at 867, 421 P.3d at 198. The decision to award punitive damages is a factual question for the jury, but this Court determines the constitutionality of the amount of punitive damages de novo. *Alexander*, 161 Idaho at 260, 385 P.3d at 438.

"In any action seeking recovery of punitive damages, the claimant must prove, by clear and convincing evidence, oppressive, *fraudulent*, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted." I.C. § 6-1604(1) (Emphasis added). Ray does not dispute that the jury did in fact find he committed fraud. Because the jury found fraud, and punitive damages are explicitly available when a party proves fraud under Idaho Code section 6-1604(1), the district court did not abuse its discretion by allowing the jury to consider punitive damages.

As stated earlier, we review a decision to grant or deny a JNOV motion using the same standard the district court applied. *Rammell*, 156 Idaho at 509, 328 P.3d at 489.

> A jury verdict must be upheld if there is evidence of sufficient quantity and probative value that reasonable minds could have reached a similar conclusion to that of the jury. In reviewing a grant or denial of a motion for JNOV the court may not reweigh the evidence, consider witness credibility, or compare its factual findings with that of the jury. The court reviews the facts as if the moving party had admitted any adverse facts, drawing reasonable inferences in favor of the non-moving party.

*Id.* (quoting *Athay v. Rich Cnty.*, 153 Idaho 815, 825, 291 P.3d 1014, 1024 (2012)).While punitive damages are not favored in the law, they may be imposed to punish unlawful conduct, which includes fraudulent conduct under Idaho Code section 6-1604(1). *Alexander*, 161 Idaho at 264, 385 P.3d at 442. Idaho Code section 6-1604(3) provides a limitation on punitive damages: "No judgment for punitive damages shall exceed the greater of two hundred fifty thousand dollars ($250,000) or an amount which is three (3) times the compensatory damages contained in such judgment." I.C. § 6-1604(3).

Initially, the jury awarded Choice Feed $49,459.22 in compensatory damages and $250,000 in punitive damages – resulting in a 5.05 ratio of compensatory damages to punitive damages. However, upon Ray's JNOV motion, the district court reduced the compensatory damages to $26,076.77, which resulted in a punitive damage award 9.58 times the compensatory damages. The district court noted that the original punitive damages award of $250,000, a 5.05

29

ratio to compensatory damages, was justified and reasonable. But the reduction in compensatory damages resulted in an unreasonable punitive damages ratio and it had to be reduced. Therefore, the district court reduced the punitive damages award to $131,687.69, to mirror the original 5.05 ratio to compensatory damages. The district court's legal basis for the reduction was solely the reduction in compensatory damages that occurred when it granted the motion for JNOV. However, we have now held that the district court erred by reducing the compensatory damages in this case. Therefore, the district court's claimed basis for the reduction in punitive damages no longer exists. Accordingly, the original punitive damages award must be reinstated. Based on this ruling, it will be unnecessary for us to address the additional claims of error Choice Feed has asserted regarding the district court's reduction of punitive damages.

We also reject Ray's remaining arguments that the punitive damages awarded in this case do not deter any conduct and Choice Feed cannot claim punitive damages when KPT was the true injured party. As to the latter argument, we again conclude that the testimony from Choice Feed was unequivocal and uncontradicted that KPT was the entity Choice Feed was forming to purchase and hold the feedlot. Even though KPT was not formed, it was Choice Feed that relied on Ray's fraudulent representations, paid extra money to Ray, and made improvements to the feedlot in reliance on Ray's representations.

As to Ray's assertion that punitive damages do not deter any conduct in this case, we disagree. We acknowledge that while Ray did not cause physical harm, he did cause economic injury to Choice Feed. Our analysis should focus on the conduct of the party against whom punitive damages are sought. "Because punitive damages are designed to punish and deter, the Due Process Clause requires that the defendant's conduct be sufficiently reprehensible." *Weinstein v. Prudential Prop. & Cas. Ins. Co.*, 149 Idaho 299, 350, 233 P.3d 1221, 1272 (2010) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)). There was ample evidence at trial from which the jury could have reasonably concluded that Ray's fraudulent conduct was reprehensible.

Ray accepted money from Choice Feed knowing that the money was intended toward purchase of the feedlot, and then Ray sold the feedlot to Gary and continued to collect money from Choice Feed without informing it. These were not the innocent actions of an unsophisticated land owner who was naïve as to the ways of property law—Ray is a licensed attorney and real estate agent in Idaho. It was reasonable for the jury to conclude that Ray never

30

intended to sell the feedlot to Choice Feed via a 1031 exchange, but deceived Choice Feed into renting the feedlot and making improvements to the feedlot until he could find a new buyer. One could easily find such conduct to be deceitful and reprehensible to a degree that necessitates punitive damages to punish Ray and deter similar future conduct. Ray's deterrence argument is without merit. This is the type of behavior Idaho Code section 6-1604(1) was intended to deter. Indeed, this case demonstrates why punitive damages have been authorized by the Idaho Legislature. Here, the award of punitive damages will serve as a stark deterrent to Ray and others from misleading possible buyers and fraudulently taking their money with no intent to deliver on their promises.

**I. The district court did not abuse its discretion by considering the punitive damages award in its prevailing party analysis or by finding Choice Feed was the prevailing party.**

Ray maintains that the district court abused its discretion by including the punitive damages award in its prevailing party analysis and by finding Choice Feed was the prevailing party below.

A district court's determination of prevailing party status is left to the sound discretion of that court and will not be disturbed absent an abuse of discretion. *Jorgensen v. Coppedge*, 148 Idaho 536, 538, 224 P.3d 1125, 1127 (2010). As we have previously noted, to determine whether the district court abused its discretion, this Court applies a four-prong test: whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg,* 163 Idaho at 867, 421 P.3d at 198. Ray re-argues the merits of the case, but fails to assert under which of the *Lunneborg* prongs the district court abused its discretion.

As the district court duly noted, a trial court does not abuse its discretion in determining prevailing party status by considering punitive damages. We have never held otherwise, and many prior decisions suggest we have had found no error with doing so in certain scenarios. *See, e.g., Alexander*, 161 Idaho at 270, 385 P.3d at 448 (neither party prevailed on appeal where the defendant prevailed on the breach of contract issue and partially prevailed on the punitive damages issue and the plaintiff prevailed on her fraudulent misrepresentation claim and partially prevailed on the punitive damages issue); *Boll v. State Farm Mut. Auto. Ins. Co.*, 140 Idaho 334, 344, 92 P.3d 1081, 1091 (2004) (trial court exercised reason in determining that plaintiffs were

31

the prevailing party even though the defendant prevailed on the punitive damages claim); *Adams v. Kreuger*, 124 Idaho 97, 102, 856 P.2d 887, 892 (Ct. App. 1991), *aff'd*, 124 Idaho 74, 856 P.2d 864 (1993) (trial court did not abuse its discretion in ruling that there was no clear prevailing party where the plaintiffs proved their negligence claims and recovered a money judgment and the defendants proved their affirmative defense of comparative negligence and prevailing on plaintiffs' punitive damages claim); *Ruge v. Posey*, 114 Idaho 890, 892, 761 P.2d 1242, 1244 (Ct. App. 1988) (trial court did not abuse its discretion in ruling there was no overall prevailing party where the plaintiffs prevailed on their compensatory damage claim, but the defendant prevailed on the claims for loss of consortium and punitive damages.). Given our prior rulings on this issue, we hold that it is within the scope of a trial court's discretion for it to consider an award of punitive damages as a factor in its prevailing party analysis. Here, the district court acted squarely within the outer bounds of its discretion by doing so because Choice Feed's punitive damages claim was integral to its fraud cause of action which was largely based on a commercial transaction under Idaho Code section 12-120(3).

Additionally, we hold that the district court did not abuse its discretion in concluding that Choice Feed was the prevailing party. The district court correctly perceived the issue of prevailing party status as a discretionary matter. The court looked to Idaho Rule of Civil Procedure 54(d)(1)(B) which directs the trial court to consider the final judgment and result of the action. Our precedent also instructs a trial court to consider: "(1) the final judgment or result obtained to the relief sought; (2) whether there were multiple claims or issues between the parties; and (3) the extent to which each of the parties prevailed on each of the claims or issues." *City of Middleton v. Coleman Homes LLC*, 163 Idaho 716, 723, 418 P.3d 1225, 1232 (2018). It considered the final judgment in relation to the original relief sought, the claims and issues between the parties, and the extent each party prevailed on each claim. The district court noted that it was a difficult determination considering the litigation, claims, counterclaims, defenses, and various theories of recovery. Nevertheless, the district court provided a well-reasoned analysis which examined each claim asserted by the parties. In the end, the district court determined:

> After carefully considering the significance of the various outcomes described above, the Court finds that the Plaintiff's success in proving to the jury that the Defendant committed fraud against the Plaintiff (resulting in an award of compensatory damages as well as a substantial award of punitive damages) makes

32

the Plaintiff the overall prevailing party in this lawsuit. The Plaintiff's success on Count 5 and the punitive damages claim outweighs the fact that the Defendant prevailed on his first counterclaim for collection of the open account for hay and the Plaintiff's Count 4 alleging Fraud. It also outweighs the Plaintiff's failure to pursue or prevail on the other claims discussed above such as the claim for breach of contract in Count 1.

Ray argues that he was the prevailing party because Choice Feed brought eight causes of action but was only successful on one of them. While technically that is true, the prevailing party analysis is not as simple as a tally of which party won the most causes of action. Many of Choice Feed's causes of action were dismissed as a direct result of its successful mediation with co-defendant Gary. For example, Choice Feed sought the feedlot and/or damages for Ray's fraudulent conduct. Choice Feed found success in its first request for relief through mediation with Gary by obtaining an option to purchase the feedlot in the future. If we were to hold this type of successful mediation against a party in determining the prevailing party, it would significantly deter future mediations or other settlement negotiations.

More properly, courts should look at the overall outcome of the suit in determining the prevailing party. *See, e.g., City of Middleton*, 163 Idaho 723, 418 P.3d 1232 (courts should look at the final judgment or result obtained to the relief sought); *Idaho Military Historical Soc'y, Inc. v. Maslen*, 156 Idaho 624, 630, 329 P.3d 1072, 1078 (2013) ("The prevailing party question is examined 'from an overall view [of the action] not a claim-by-claim analysis.' ") (internal citation omitted);  Here, Choice Feed's causes of action did not seek eight discrete forms of relief; rather many of its causes of action were largely alternate legal theories upon which it was seeking the same relief it ultimately received. Choice Feed was ultimately successful on one of its two fraud-based claims against Ray. The final judgment obtained by Choice Feed was substantially close to the original relief sought.

Given its careful and thoughtful analysis, we conclude that the district court did not abuse its discretion. It correctly perceived the issue of prevailing party as a matter of discretion, it acted within the boundaries of its discretion, it applied the correct legal standards, and it exercised its reason to reach a decision. Therefore, we affirm the district court's determination that Choice Feed was the prevailing party.

**J. The district court did not abuse its discretion by awarding Ray prejudgment interest on his hay claim.**

Choice Feed cross-appeals and contends that the district court abused its discretion by awarding Ray prejudgment interest on his outstanding hay claim because his motion for prejudgment interest was untimely and Ray failed to prove that Choice Feed received an invoice for the hay.

We initially reject Choice Feed's latter argument. It is unclear whether Choice Feed raised the invoice argument below. There was a telephonic hearing and briefing on the prejudgment interest issue, but none of those documents were certified as part of the record on appeal. The district court's order and opinion on the prejudgment interest issue does not address the invoice argument – evidence that it was possibly never raised by Choice Feed. Even if addressed, Idaho Code section 28-22-104 does not require an invoice. All that our precedent requires is that the "damages are liquidated or are ascertainable by mere mathematical process" and "the amount to bear interest must be liquidated." *Bouten Const. Co. v. H.F. Magnuson Co.*, 133 Idaho 756, 762, 992 P.2d 751, 757 (1999). Contrary to Choice Feed's assertions, the district court found Ray's counterclaim damages were liquidated and easily ascertainable by mathematical process and the jury awarded the amount Ray requested. Moreover, the district court explicitly found that Choice Feed acknowledged all along that it owed the debt to Ray, and never paid it, instead relying on an offset after trial. This fact was never challenged by Choice Feed on appeal. We do not presume error where there is none shown, and we do not presume the lower court ruled on something when it is not addressed in its opinion. Because there is no adverse ruling on this invoice issue for us to address, we decline to review it.

This Court reviews an award of prejudgment interest for an abuse of discretion. *Dillon v. Montgomery*, 138 Idaho 614, 617, 67 P.3d 93, 96 (2003). Once again, to determine whether the district court abused its discretion, this Court applies a four-prong test: whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg,* 163 Idaho at 867, 421 P.3d at 198.

Initially when Ray requested prejudgment interest on his hay claim, the district court denied his request as untimely because Ray made the request ninety-one days after entry of the judgment. However, due to Ray's partial success on his JNOV motion, the district court entered

an amended judgment. Shortly thereafter, Ray re-asserted his claim for prejudgment interest. That time, the district court granted his motion.

Choice Feed argued Ray's motion was still untimely because the issue could have been raised much sooner but Ray failed to raise it. We have not previously ruled on this precise point of law, but the Court of Appeals addressed a similar issue in *W. World, Inc. v. Prater*, 121 Idaho 870, 828 P.2d 899 (Ct. App. 1992). There, the appellate court recognized the inherent tension between the 14-day deadline for filing a motion to amend a judgment under Idaho Rule of Civil Procedure 59 and the similar deadlines in Rule 54 for requesting costs and attorney fees and held: "Instead of the strict approach taken by the district court, the court should have reconciled the perceived tension between the two rules in a more liberal fashion. The court should have recognized that the right to costs, and an award for attorney fees, would mature anew when an amended judgment was entered …" *Id*. at 873, 828 P.2d at 902.

Although the text of Idaho's Rule 54 and its federal counterpart are not identical, the district court turned to the comments to Federal Rule of Civil Procedure 54 for guidance. The commentary to Federal Rule of Civil Procedure 54 states: "A new period for filing will automatically begin if a new judgment is entered following a reversal or remand by the appellate court or the granting of a motion under Rule 59." Fed. R. Civ. P. 54, Advisory Committee Notes to paragraph 2. While not precedent, we agree with the rationale behind such an approach and that suggested in *W. World.* Accordingly, we hold that it was not an abuse of discretion for the district court to consider Ray's motion for prejudgment interest..

The district court recognized that prejudgment interest is an issue of discretion for a trial court. It also recognized that Idaho Code section 28-22-104 allows the award of prejudgment interest on open accounts. The district court expressed its concern with the applicable standard of review for an award of prejudgment interest. It noted that the statute does not contain mandatory language, but the district court felt case law required it to award prejudgment interest when it was requested and when it fell within Idaho Code section 28-22-104. The district court then made note of the equitable principles involved in this case: (1) Ray committed fraud against Choice Feed causing monetary damages; (2) Ray's conduct was sufficiently reprehensible to award punitive damages; (3) Choice Feed always conceded to offset open hay account claim against any other damages awarded; (4) Ray may have obtained the debt on the hay account as leverage against Choice Feed; and (5) Choice Feed acknowledged the debt all along and never

35

paid it. The district court did not abuse its discretion by considering these equitable principles – prejudgment interest often requires a trial court to consider such equitable factors. *See Chenery v. Agri-Lines Corp.*, 115 Idaho 281, 289, 766 P.2d 751, 759 (1988). The statutory language under Idaho Code section 28-22-104 contains permissive, not mandatory language; this implies that courts are not required to award prejudgment interest, but it is left to their discretion even when the situation falls within the parameters of the statute.

In the end, after it weighed all of the equities, the district court chose to award Ray prejudgment interest. We conclude that it did not abuse its discretion by doing so. The district court provided a well-reasoned legal analysis that recognized the decision was one of discretion, it noted the applicable legal precedent, it reached its decision by reason, and its decision was within the boundaries of its discretion. Therefore, the district court did not abuse its discretion by awarding Ray prejudgment interest on his open hay claim.

**K. Attorney fees and costs are awarded to Choice Feed on appeal as the prevailing party.**

Choice Feed requests attorney fees on appeal pursuant to Idaho Code section 12-120(3) or Idaho Rule of Civil Procedure 54. Idaho Code section 12-120(3) allows "the prevailing party" to be awarded reasonable attorney fees when the case involves a "commercial transaction." I.C. § 12-120(3). The parties do not dispute that this case involves a commercial transaction under section 12-120(3). "In determining which party prevailed where there are claims and counterclaims between opposing parties, the court determines who prevailed 'in the action;' that is, the prevailing party question is examined and determined from an overall view, not a claim-by-claim analysis." *Shore v. Peterson*, 146 Idaho 903, 914, 204 P.3d 1114, 1125 (2009) (citing *Eighteen Mile Ranch, LLC v. Nord Excavating & Paving, Inc*, 141 Idaho 716, 719, 117 P.3d 130, 133 (2005)). *See also* <u>*State, Dep't of Transp. v. Grathol*</u>, 158 Idaho 38, 53, 343 P.3d 480, 495 (2015) (applying this same analysis on appeal). Choice Feed successfully responded to and defended each of Ray's issues on direct appeal. On its cross-appeal, Choice Feed was successful on two out of the three issues it raised. It was only unsuccessful on its cross-appeal issue regarding the district court's award of prejudgment interest to Ray. Accordingly, because we deem Choice Feed to be the overall prevailing party on this appeal, it is entitled to attorney fees under section 12-120(3).

Costs are also awarded to Choice Feed as the prevailing party as a matter of course under Idaho Appellate Rule 40.

## IV. CONCLUSION

For the foregoing reasons, we affirm the decisions of district court on all issues raised in Ray's direct appeal: (1) to deny Ray's motion to dismiss for Choice Feed's failure to plead fraud with particularity; (2) to give jury instructions that conformed with the evidence presented at trial; (3) to allow Choice Feed to seek improvement expenses as damages at trial; (4) to allow the jury to consider punitive damages; and, (5) to consider punitive damages in its prevailing party analysis and its conclusion that Choice Feed was the prevailing party. We also reject Ray's argument that Choice Feed did not have standing to bring suit or that it was not the real party in interest and we decline to add a tenth element of a transfer or sale of property to common law fraud.

On Choice Feed's cross-appeal, we reverse the district court's decision to grant Ray's JNOV motion and reduce the compensatory damage and punitive damage awards as raised in Choice Feed's cross-appeal. However, we affirm the district court on Choice Feed's remaining issue raised in its cross-appeal concerning the award of prejudgment interest to Ray on his open account hay claim. Costs and attorney fees are awarded to Choice Feed as the overall prevailing party on appeal.

Chief Justice BEVAN and Justices BURDICK, BRODY and STEGNER **CONCUR.**